Good morning, Your Honors. Monica Wiener of Munger, Tolles, and Olson, on behalf of the appellants who, for purposes of convenience, I'll be referring to this morning collectively as OCZIP. I will be arguing this morning in place of Mark Shinderman, who unfortunately had another conflict this morning. Thank you. Could I ask you to spell your name for me, please? Yes, it's W-I-E-N-E-R. First name is Monica, M-O-N-I-K-A. Thank you, Ms. Wiener. Now, Your Honors, at this time I'd like to reserve four minutes for rebuttal. Sure. Thank you. The issue before the Court this morning is whether the bankruptcy court abused its discretion when it approved a settlement between the debtor, Sun World, and his insider and parent, Cadiz. Well, let's start with the hard part. This Court reviews that decision for an abuse of discretion. But this Court has held that it is an abuse of discretion for the bankruptcy court to approve a settlement where there's an insufficient factual basis to support the conclusion that that settlement was fair and reasonable under the circumstances in that case. Now, that is the standard in any case, any settlement that is approved by the bankruptcy court. Here we had circumstances that include an insider transaction between a parent and subsidiary. And under those circumstances, the Supreme Court requires an additional level of more rigorous scrutiny to ensure that the settlement is fair. Now, what does that mean here? It seems to us, Your Honors, that there would need to be some kind of independent disinterested review, such as the sort of review that the creditors committee initially requested to make here. In fact, the creditors committee had requested to make an independent evaluation of these claims. But that didn't happen here. At the very least, the standard requires, and this Court has held that, it requires a rigorous and independent review, an informed and independent review, resulting in an informed and independent judgment by the bankruptcy court. That didn't happen here either. The Court glossed over a number of important legal theories, important defenses that the debtor may have had to these claims, and in addition, affirmative counter claims that the debtor may have been able to bring against Cadiz. Some of the creditors did like the deal, right? Absolutely, Your Honor. Not as such, but as part of an overall kind of deal that was being made, so that some of the creditors, I guess a lot of the creditors, really thought it was okay, right? Well, Your Honor, there were not. I know that you believe once they thought that, that they weren't disinterested anymore, but the point is. That's correct. I understand that. But the point is, they did think that. A lot of them thought, this is a pretty cool deal. At the end of the day, we like this, right? Well, perhaps. I'm not sure whether Your Honor is referring specifically to the note holders. Obviously, they. Excuse me? I'm not sure whether Your Honor is referring specifically to the note holders or the trade creditors, but those were two constituencies that did ultimately come down in favor or approve or withdraw. The note holders were actually part of the settlement, but the trade creditors did in fact, and the creditors committee as the representative, the trade creditors constituted a majority of that committee, did in fact withdraw their objection to the settlement. So the two directly involved parties, for whatever it's worth, thought it was a good deal. A large number of creditors thought it was a good deal. Well, Your Honor, I'm not sure. But none of those people really reviewed it independently. Only, so we shouldn't consider what they thought, right? Well, Your Honor. I think that's what you said a moment ago. I'm not sure that it's fair to say that they thought it was a good deal. Perhaps the note holders thought it was a good deal because they were getting essentially. They didn't object, I guess would be. Correct. They did not ultimately object, but the withdrawal of their objection was based on a side deal essentially that was cut at the last minute. For the trades. With the trade creditors who were a majority, a voting majority of the committee. Sure. And this was a sine qua non to getting the other piece to work. It was sort of working jointly. By the way, has that been approved or is that all held up? I'm just curious. I'm sorry. The overarching one. This was a piece of an overarching one. Correct. As far as we know, Mr. Bogunov can probably speak to this more directly, but the plan has not yet been confirmed. And as I understand it, there's not currently a date on the calendar for confirmation of the plan. The overarching global settlement that this piece was a part of, the settlement as between the note holders and Cadiz and the debtor, I believe the terms of it were that it would go forward provided that the settlement was within a certain range and it did fall within that range. Why don't you tell me how, because you were an unsecured creditor, correct? Correct. Why don't you tell me how Oz would benefit from the court's rejection of the bankruptcy court's approval of this initial settlement? Well, essentially, Your Honor, we don't know. I think it's fair to say. Well, you wouldn't object if you didn't know something. Our objection is based on principally what we don't know, but also what we do know. And from what we do know, it appears to us that the settlement wasn't fair. So to the extent that a fuller investigation is made. Okay, but fair is not a standard that we look at. We're looking at abuse of discretion. That's correct, Your Honor. However, I do think that within that standard, abuse of discretion, and this is what I was referring to in the beginning, it is an abuse of discretion. This Court has clearly held to approve a settlement agreement where there is an insufficient factual basis to find that the settlement was fair. It begins to sound a little bit circular, but there is a standard. Well, because if you define fair as getting all your money, generally in this type of situation, no one's going to get all their money, right? That's absolutely true. I mean, or we wouldn't be in bankruptcy court. Correct. It becomes a question of how much of the pie Haviza's claim ought to be taking up, I suppose. There must be some, if you're objecting to it, there's some reason you think you would be in favor of this, and what, tell me what that is. We believe that it, based on what we've seen, Your Honor, we believe that it may not have been fair. We believe it was most likely not fair. You know, that's sort of standing back and saying no fair, no fair doesn't quite do it. You mean you're just sort of disinterested parties who just think, well, we'd like things to be fair, and we're not sure this is fair, but we don't expect to gain anything and we don't know what we would gain, we might actually lose. The bankruptcy judge thought, you know, if you guys manage to throw a monkey wrench into this deal, what might happen is that everything will collapse into a mess, and Sun won't get out, and neither will Cadiz. Everybody will collapse into a great, filthy mess, and that's what a lot of the creditors apparently thought, and note holders thought, and you say no fair. And I think it's a fairly, it's a fair question to say when you say no fair, what ain't fair about it? Who's getting hurt? Why are you being hurt? Is anybody being hurt? Is everybody being benefited? But you just say no fair. I mean, that's what you're saying to us, that somehow that doesn't quite get there? The debtor threw out a lot of hypotheticals in connection with why this settlement ought to be approved, why it ought to be approved quickly, in terms of what would happen between itself and Cadiz, and specifically what would happen to Cadiz if the settlement wasn't approved. Those are all hypotheticals, but this much we do know. We know that Cadiz had asserted claims which the debtor estimated at $17.5 million against the estate. So those claims were going to take up that portion of the amount that was available, that pro rata distribution that would be available to unsecured creditors. The settlement, the currency of the settlement in this case, was in terms of the allowed amount of Cadiz's claim. We know that the debtor was starting with $17.5 million in that regard. To the extent that that amount should have been less, and ultimately the settlement was $13.5 million, and we think it probably should have been substantially less than that, that increases the amount that would have been available for other unsecured creditors, such as OTSIF. So even though a secured creditor is getting, what, $4 million less? I mean, you're saying they should have gotten $6 million less, and that would leave $2 million more that might give you a chance of getting some money? Correct. I mean, because obviously you're on the bottom of the food chain as an unsecured creditor any way that you look at it, so you're thinking that there's going to be less of a pot of gold, or less of a pot to get from with this approval, right? That's right, and essentially in the weird world of bankruptcy, that's a little bit dog-eat-dog. Remind me, how much are you owed? I'm sorry? How much are you owed? We are owed $5 million, approximately. Okay, and the bankruptcy judge said, what I really think will happen if this doesn't go through, is that everything will collapse into a big mess. And maybe, you know, after years of litigation, after years of litigation with today's, the note holders will have foreclosed, all kinds of horrible things will have happened, and there won't be anything left at the end. And here at least there's some chance that something will be left. That's what the bankruptcy judge seemed to have said. Something like that. I think that's a fair characterization. First of all, I would note, Cadiz was not in bankruptcy. What was before the court was not necessarily the fate of Cadiz, but of Sun World. Oh sure, but if Cadiz, obviously, but the court's saying, obviously if the whole thing falls into the bucket, it's just going to cause a lot of harm, and there won't be anything coming back. There won't even be the 13.5 assignment for the note holders. I think what was missing here was a real link between this parade of horribles that was going to happen if the settlement was not approved, and the need to approve the settlement so quickly. And in fact, it appears that circumstances have not really borne out all of these fears that the debtor had about getting this, getting itself out of bankruptcy post haste. That's not the test for abuse of discretion. I'm sorry, what is not the test? I said that is not the test for abuse of discretion in approving the deal, is it? No, Your Honor. The test is, was the settlement fair? Absolutely. From the front end? From the front end. From the front end. Did he abuse his discretion when he said, I see all these problems? But at that point, Your Honor, the problems were hypothetical, and they were stated in a fairly general way, that you're going to have gigantic inter-estate battles that are going to bog down both estates. Well, that has not materialized that had this settlement not been approved, I'm not sure we would be in a much different position. How would it materialize? I mean, the point was they're not having a big chunk of litigation. So, of course, it hasn't materialized yet. If you're successful, maybe it will. But of course, the future is always hypothetical, is it not? That is absolutely true. However, I think that the key here is, once again, Cadiz was not in bankruptcy, and the debtor makes it very clear in its motion that was one of the real goals here, was to keep Cadiz out of bankruptcy. Well, the Court was not concerned with the fate of Cadiz, and there are two sides, really, to the coin, that the Court needed to weigh, and that the debtor needed to weigh, the probable success, the probability of success in the litigation, that at the end of the day, Sun World, not Cadiz, Sun World in and of itself, and Sun World's creditors, would wind up better off had this litigation gone forward, or at least had they pursued a more thorough and independent evaluation of these claims. And that side of the coin was really only addressed in the most general terms. There were substantial defenses to these claims that the debtor simply didn't address. And the other side of the coin is the complexity, the duration of the litigation. Again, that was addressed really in the most general terms, that any preference case is going to be difficult to prove, that, for example, I believe the Court stated simply equitable subordination is a disfavored remedy. But without really linking those two sides, what's the upside versus what's the downside? We know that the Court believed, and the debtor asserted, that this would have been a long and drawn-out process to litigate these claims. That would be true. But there was a huge potential upside, particularly as to some of the affirmative counterclaims that the debtor missed, or did not address adequately, simply glossed over, such as equitable subordination and recharacterization. Those claims could have reduced Cadiz's claim to zero. And on the side of defenses that the debtor may have had to these claims, there really was no analysis at all. There really was a simple taking of at face value of Cadiz's asserted claims. I don't know. We're dealing with a pretty knowledgeable about this case and experienced and perspicacious bankruptcy judge. In fact, if I recall the transcript, he's asking Oz's counsel a number of times. He says, Are you aware of this particular problem or the cases that deal with this particular this particular problem of showing insolvency or et cetera? And the counsel says, No, I'm not aware of those. And the judge says, Let me tell you about some of the problems from some of the cases I've seen. And that goes off a couple of different times. So the judge isn't isn't stupid about what the problems are. And he's not stupid about what the upsides and downsides are, at least not from the transcript, he doesn't appear to be. It's kind of hard to see how we say, Well, you just didn't know what was going on, Judge. Absolutely, Your Honor. The judge, I'm sure, has seen many more preference cases than I myself have and could make generalizations based on those cases at a very high level and probably quite accurately. The point is generalizations aren't good enough here. We needed to move beyond those generalizations that, well, okay, in this context of preference litigation or equitable subordination or whichever claim was being addressed this would be a long and drawn out and difficult litigation process. That's true of a lot of different kinds of claims. But again, you have to look at the flip side. You have to look at what the probable outcome might have been and what the benefits could have been had that litigation succeeded. You mentioned you wanted to reserve a couple of minutes. Yes, Your Honor. Thank you. Thank you. May it please the Court that good morning, Your Honors. My name is Lee Bogdanoff, a member of Klee, Tushin, Bogdanoff and Stern. I'm appearing on behalf of the appellees of Sun World Estates. The question, I think, as Your Honors have indicated here is whether an abuse of discretion occurred. And that test in turn requires a showing, I think, that Judge Nagel clearly exercised a bad judgment in approving this settlement. What about the sufficiency of the findings? Well, Your Honor, I believe that was addressed in the ANC Properties case. In ANC Properties, virtually the identical contention was made here was that the findings, the fact and conclusions of law of the judge just recited his consideration of the four factors. And following well-established principles, this Court held that so long as the record fairly supports the Court's conclusions and it's clear that the four factors were presented to the Court then there is no abuse of discretion if the Court does not make specific enunciations as to these aspects. I should also point out, as one of you did, it is exceedingly clear that Judge Nagel was actively engaged. He formed conclusions and opinions regarding the matters that were in front of him, including counsel devoted her attention almost exclusively to the resolution of the litigation claims and the claims. It's very clear that Judge Nagel was mindful and aware of this Court's rulings and the governing case law. So I think there is sufficient evidence, sufficient record to establish that it was all there in front of him and that there was no abuse of discretion. I should also point out that the record here was exceedingly lengthy. We filed a detailed memorandum of the law. It was 35 pages, which is the maximum that we were entitled to file. We submitted documents, transfer records, each and every transfer from Sun World and Cady's and vice versa. Over the prior three years preceding the petition was in front of the judge. We submitted two affidavits. There was additionally two full days of depositions. There was discovery propounded by OXIF going back from 1999. I should also point out that we filed this motion nine months into the case, not on the first day of the case. And there was ample opportunity through Rule 2004 and otherwise for parties to conduct a discovery and to file a settlement. This was not what Judge Anderson in his memorandum opinion affirming. And clearly Judge Noggle understood that this settlement was not just about the resolution of claims but rather it was the finalization of a financial divorce between Cady's and Sun World under which the various contracts between the two organizations were rejected. As well, Cady's agreed to waive and relinquish any effort to attempt to recover on its equity in Sun World. That was in the settlement agreement and was a benefit. And going to the so-called parade of horribles, I think it is clear that there would have been a great filthy mess as Your Honor indicated had this settlement not been approved. There was evidence in front of Judge Noggle submitted by Cady's a publicly held company that it was the subject of an imminent foreclosure that its owner was a man who had no appetite for that outcome. The evidence in front of the Judge  just Judge Noggle's conclusions and he wasn't basing it solely on a pleading filed by Cady's was evidence in front of Judge Noggle and Judge Noggle's independent director Mr. Beek as well as his chief financial officer both testified in declaration and in great detail in deposition of their concerns regarding Cady's bankruptcy and the prospect that it would result in a mess between the two entities and Judge Noggle clearly got it he made findings about it I think his very final comment in ruling on the motion was the possibility that Cady's in some world had the ability to kill one another he talked about rearranging the deck on the Titanic he didn't just make that stuff up he clearly read and understood the evidence and the presentation as to what was at risk one of the points that I gathered was that this was supposed to be really a piece of a puzzle and the overall puzzle was an agreement a different agreement with others I'll ask you the same question I asked the opposing counsel has that happened well is it happening or what's going on let me tell you what happened as a result of Judge Noggle's approval of the settlement of their right to pursue Cady's occurred as a result Cady's effectuated its restructuring and its recapitalization and has gone on its way with respect to Sunworld we went ahead and filed a plan of reorganization premised upon this deal and the good feelings that existed between the note holders who were cooperating in negotiating this agreement with us it so happens that the note holders have engaged in protracted negotiations concerning the terms of the plan of reorganization that we subsequently filed they were unable to reach agreement and we do not  a plan that requires or investors with a view toward effectuating a transaction either next month or early next year so the agreement that was in front of the judge has been implemented and it has worked by its terms and we think it was appropriate on the circumstances presented and in retrospect the bigger picture that is our efforts to get out of bankruptcy have stalled and that's where we are well part of what the judge was told was that I believe some of the creditors the trade creditors who were not objecting or withdrawn objections because part of the deal was somewhere in the background they were going to get taken care of to some extent and they would continue to advance credit yeah what happened is  settlement has fallen in place or is that gone well that that is subject to it will be in place when the plan is confirmed that aspect of the settlement will be implemented what happened was the creditors committee no no they have not fallen off that wagon that promise that was made by the note holders on the other  of the wagon that was made by the  holders on the other side of the wagon that made by the note holder by the note holder on the other side the Wagon that was also made by John Perkins on the other side
judges: Fernandez,silverman,callahan